C.L.A.S.H., Inc., et al., Appellants v. Marcia L. Fudge, Secretary of Housing and Urban Development in her official capacity, and United States Department of Housing and Urban Development, Mr. Joseph for the appellants, Ms. Powell for the appellants. Mr. Joseph, please proceed when you're ready. Good morning, Your Honors. May it please the court, my name is Lawrence Joseph, I'm representing the appellants. I'd like to first touch on two related housekeeping issues. One, as I mentioned in a 28-J letter, one of the appellants, Mr. Fields, I've lost contact with him. His injuries are no different than anyone else's, so we don't think it affects the Article 3 context of the case. Having just listened to the prior argument about Article 3, I noticed that we didn't brief standing. The court below held that we had it. I just want to assure you that there is an ongoing Article 3 case or controversy. Basically what's happening here is HUD regulates public housing authorities, PHAs, where my clients are tenants, or in the case of Clash, an interest group that has tenant members and advocates on behalf of tenants. Before this mandate, some PHAs had smoking bans, some had less onerous ones than HUDs, and then HUD comes along and says you have to have this as a condition of the federal money you receive. So now all of the PHAs have adopted smoking bans, but if we were to succeed in withdrawing the HUD mandate, my clients would be free to negotiate with their PHAs to ameliorate the smoking bans or to rescind them entirely, whereas they can't do that now without HUD's pressure. There's numerous cases for that kind of injury, which is affecting their article. By the way, these are government entities, the PHAs and HUD, of course. So it's not only interfering with their contract between landlord and tenant, it's also interfering with their ability to petition government. So I hope there's no question about Article 3 anymore in this conversation, but given the length of Article 3 in the last case, I wanted to flag that. JA-114 would be the place where that standing is established and that ongoing interest to want to petition the PHAs and the HUDs in the way. So I think we're good on Article 3, other than Mr. Fields, who I don't think matters. I think the recent Supreme Court stay of the CDC's eviction moratorium is a pretty good framework for this case. We filed a 28-J on that a few days after the Supreme Court issued it. And essentially there, as here, you've got an old statute that an agency has sort of – an old bottle that the agency has tried to pour new wine into in a way that hasn't happened before. It's not clear that they have that authority, the federal agency. They're working in an area, landlord, tenant, et cetera, where there's a strong federalism presumption that the agency's statute should be read narrowly. Can I just clarify, though, because I was a little confused by your 28-J letter insofar as my understanding is that the Alabama Association case involved an entirely different agency than the one at issue here and a different statutory scheme. So what is it about this case that you think either informs or governs this court's consideration of whether HUD has the authority to do what it did in this case? Well, it's more of an analogy than a holding. It's a holding I suppose on the issues of the federalism component of the landlord-tenant relationship. That's something we've briefed as well separately, but it reinforces that. Certainly it's a different statute in their favor. That is CDC's favor. They have an emergency that's not at issue in our case. But the point is you've got a statute that's been around for a long time, and the agency tries to creatively come up with new authority to do something new that they've not done before. But you're right. We're dealing with the Housing Act, not the Public Health Safety Act. Can we explore a little bit how new and what you mean by the agency is doing something that it hasn't done before? The reason why I'm asking is because I looked up the regulations about lease requirements from HUD, and there's like a long list of stuff that HUD routinely requires PHAs to put into their leases. So when you say this is something new, you're not saying this is something new because HUD has never asked or required PHAs to have certain lease conditions, right? Certainly. It goes into the lifestyle aspect of this particular decision. They're actually claiming to regulate how you interact with members of your own household. So by analogy, for example, when – with regard to pets or lead paint, the Congress has amended the statute to sort of allow them to deal with that. Now, lead paint is more serious than pets. Pets is more like a lifestyle thing, although it certainly has – cats can scratch things. So there are effects, but the point is before the HUD ventured into those sensitive areas, there was statutory authority, and the same thing happened again by analogy, different statute with cigarettes and the FFDCA, the Food, Drug, and Cosmetic Act. There, something that looked a lot like a regulated commodity, cigarettes, the Supreme Court said, well, no, that's not clear that Congress is going after this kind of, in our statute, in our context, lifestyle. But, Mr. Joseph, the lifestyle aspect that you're raising is but one of the two major premises for justifications for the regulation in question. The other has to do with fire safety, with damage to the property. I mean, there's a reason that private landlords all over the country, maybe all over the world, are also prohibiting smoking where they can, airport authorities and so on, because it causes damage. And when you have tenant turnover, there are extra costs to repairing the apartments. Why isn't that a completely – it is a completely separate justification. Why isn't it unimpaired by your lifestyle argument? Well, the – if the lifestyle – if the lifestyle issue were stricken, then they'd have to reconsider their rule. They didn't consider alternatives like have a deposit or like have fire insurance or – certainly as to the smoking has to be more than 25 feet from the door. If they were just concerned about those issues, they would have smoking facilities closer to the door. But they're trying – they're focused on the lifestyle thing. I understand – Why are you saying that? What do you mean by the lifestyle thing? Because I understood the statute to cover health and sanitation, and we're talking about air quality in the building. So are you equating lifestyle with air quality? Is that what you mean? Fair enough. I'm using a shorthand that I shouldn't have. I mean they are trying to regulate lifestyle, meaning the sense of they're trying to discourage smoking. And the intra – so there's the intra-unit exposure that they say they're trying to regulate now, and then there's the inter-unit exposure, which is – they quite frankly didn't document that well enough we think for a constitutional challenge. So – So you perceive them as not telling the truth when they say that the reason why they're regulating this is because they have evidence concerning the secondhand smoke effects, the effects on health and safety, and the fire risks. You think their real reason is just they don't want their tenants to smoke inside the building – to smoke. There is a pretextual aspect to it, yes. There are – on top of that, if the opposition to smoking were removed, there would be other regulatory alternatives that they didn't consider, and that would make this arbitrary and capricious. Did you argue that? Yes. I know you argued pretext. Did you argue that the – that if the sole justification were the fire safety and damage prevention, that there was – as you just said now, they would have had to consider alternatives that they didn't and so on? Yes. We cited the MVMA case on that proposition, cited the different things. You argued this before the agency. There was notice and comment by this agency. Did you put that in the record before the –? Oh, I'm sorry. You're asking about the comment period. Yeah. Yeah. You can't raise an exception here you didn't raise with them. Fair enough. So we argued it below in the district court. We argued it here in this court. We did argue in the comments that the – that their data were pretextual. That's different. Okay. I honestly don't know the answer to your question. My concern is I think they have an adequate and independent ground on which to rest the lease requirement, which you have not really touched, and therefore would be sufficient to uphold the requirement. It's a little challenging, the difference between a constitutional challenge and an APA challenge because in a constitutional challenge, if it's a rational basis standard, then under Peller and other cases in that canon, they don't even have to say the reason – they don't even have to get the reason that they're regulating right if it's as long as you – Right, right. So on that – This is a statutory question as far as I'm concerned. On the – so on the constitutional side – if I've missed your question, I apologize. Let me finish this thought if I could. So on the constitutional side, you can make things up, but on the APA side, it needs to be something that they justified in the record. That's where I'm coming from. No, I understand. But there's another facet to that that sort of flips those, and that is that on the constitutional side, it's less clear that we're bound by the record. There's – Yes. I grant you that. Okay. And so with that context that in constitutional, we're at a disadvantage if you can make up a new answer, but we're at an advantage because we can go beyond the record. Maybe I don't understand your question. Assume with me for the moment that your – for one thing, that we'll start with the non-constitutional issues, which we ordinarily do. Right? We don't reach a constitutional issue. We don't have to. And if your statutory issue – so we need to deal with, first, do your statutory claims survive? Are they properly presented? I'm suggesting that – a reason that the agency has an independent ground that you have not challenged, and therefore your APA concerns are not well taken. And then we can move on to whether you have any constitutional ground for objection. I believe the – so I don't think that anyone has raised your question, which I concede is a good question. But had they raised it, we would have rebutted it. So I'm going to need to do two things if I could. I need to go and look at the comments that may well be there. I don't know. And – Well, the red group certainly suggests that they have some independent ground in their concern with their proprietary interest in the structures, right, and the fire and safety and so on. Oh, but there – I mean we were – we did rebut those arguments when they raised them. They raised them for the first – they raised them for the first time in district court. It's in the rulemaking document. And what is the it? Data about the effects – the costs of having smoke damage to the buildings. They put a dollar figure on it. I see. So I'm going to have to look and see the extent to which we raised those arguments. I don't believe that's been put to me to respond to in court yet. So I don't know the answer. So can we do it as a hypothetical here today? Okay, so if the agency says setting aside air quality and secondhand smoke effects and the health risks, totally aside from that, the reason why we are requiring this is because there is a risk of fire to our buildings and smoke damage to our buildings, and we want to make sure that that doesn't happen. So we are requiring PHAs to put in their leases no tenants can smoke. That's the only thing. Are you saying the agency does not have the authority to do that under the statutory provision at issue here? I think the answer is yes. If it's pretextual, if there are other things that they could have considered to ameliorate those same things, their failure – they had an agenda here. The failure to consider reasonable alternatives is something you can raise if you suggested them in the rulemaking and they didn't consider them. I'm pretty sure we suggested a no project alternative. I understand that, but you're just now saying deposit damage for damages and so on. This is 11 in the red brief, the summary of their argument. Determined that the prohibition would also reduce deaths, injuries, and property damage caused by smoking-related fires, as well as maintenance costs. As I said, they argue that later on, this is the summary, and they put a dollar figure on it. So it seems to me that your APA argument just has to rise or fall on whether you've done – rebutted that or even raised it, and I don't think you have. And, again, the place where we would have raised it is in the comments, not because we've argued against this. Then you'd have to preserve it in your blue brief, and I don't think it's there. I don't think you – I mean, I realize you said pretext, but I don't think you said that even if it's not pretext, if it's an independent ground, it's somehow deficient. Am I correct in that? In that, we can tell by looking at the blue brief. And to move things along, I'll start with your summary. Well – There. It's further into the brief, but it's not in the summary. The point that we tried to rebut this with is that they would have had to consider alternatives that they didn't consider if this fire safety-only rationale were raised. If you had proposed them before the agency, yes. I see. And I don't know if we had. We briefed it, but we – in both courts, but we – I mean I'm not sure if you're saying that the blue brief waived it or that the blue brief failed to preserve that we raised it in the – for the agency. If it's not in the blue brief, it's forfeited. If it's not raised before the agency, then it was forfeited earlier. Well, I think we did raise all this in the blue brief. I can try and pull that up and find where. Or perhaps I could bring that up in rebuttal. Why don't you do that? Sure. And similarly, if we go to the constitutional issues, of course the government needs only one valid claim of authority. And their most promising one, I would say, is the spending clause because the question there would be whether they're making a legitimate permissible condition on the expenditure in question here. Correct? That's the only basis that they have for – on the passive restraints and some subsequent as well, but it seems to be well within the range of conditions on expenditures that the government has been upheld in imposing. Well, that's not the only part of the analysis. It's ambiguous. It's not even clear if it's enforceable. Their enforcement authority only extends to things that are substantial. They're trying to say this is a change in – a mere adjustment, but you first have to ask is it, quote, substantial, unquote, under their enforcement authority. If it is, then it's not a mere adjustment. If it's not, then it's not even enforceable, and they should take away the mandatory language. It's coercive in the sense that they – I mean they not only claim the ability to terminate funding, but that's assuming it's enforceable. By the way, let me ask this. Is there anything in the record that shows – I don't think you've raised it in your briefs – the extent to which PHAs rely upon HUD funding? We – You say they do, but there's no numbers that I can see. There were – we cited to – I mean essentially what happened is that we didn't address that. We sort of assumed that they – that these local agencies rely on the money. HUD did not counter on that issue. This case was decided on cross motions for summary judgment. So we would argue that that's an issue that they didn't win on either. This is not a 12B6 motion that we failed to state a claim. We think it's either coercive or it's not. And so what we did in a post-judgment motion is we – It's on you to show that it's coercive, that that's just the way that the burdens lie. Well, to get – for us to get summary judgment, but they got summary judgment, which means that it's not coercive. Right, but they can get summary judgment by showing that you didn't meet your burden. Right. Oh, I would have thought it was – there was an excluded middle there, which is neither side prevailed on the issue of coercion. But in any event, in a post-judgment motion, we submitted evidence. It's judicially noticeable. You can look at judicially noticeable evidence on appeal. We haven't moved separately for judicial notice, but we have pointed you to that from the appendix, in the joint appendix. I can find that site. Let me make sure my colleagues don't have additional questions for you at this time. We'll give you a little bit of time for rebuttal, but if not, then why don't we hear from the government? Thank you, Mr. Joseph. Ms. Powell? Thank you. Good morning. May it please the court. Lindsay Powell for the government. The rule that's at issue here is entirely in keeping both with prior standards that HUD itself has promulgated under the same authority to establish standards for safety and habitability in public housing, and it's also in keeping with the actions of other public and private authorities. So this isn't really breaking new ground in the way that's being suggested. Even prior to the rule, there were hundreds of public housing agencies that had implemented similar rules, dozens of municipalities, and this includes prohibiting smoking within individual dwelling units, and then many private landlords do the same. And the reasons for that are made clear in the administrative record here. HUD amply documented the significant risks of smoking in and around buildings. We have the substantial fire risk at the time the rulemaking record was put together. Smoking was the number one fire risk in these buildings. There is other property damage that ensues. And then, of course, the science of secondhand smoke and inter-unit transfer is itself well documented in the rule and prior to that by the search in general. So all three of these provide a substantial basis for the decision here. I think, Ms. Powell, the problem with secondhand smoke, if there is one, is not that it's not harmful. It's that it's not shown how the degree to which it ever permeates someone else's apartment. Yes, Your Honor, that is absolutely something that HUD addressed in the rulemaking, and it is borne out by the science here. So that's addressed at length in the NPRM. It is what? What was borne out by the science? That inter-unit transfer does occur and that it causes harm. That is in the rulemaking record here. And there were some comments that superficially contested that, and HUD addressed those in the final rule, again, reiterating both the harms from secondhand smoke itself and the fact of inter-unit transfer, including the demonstrated scientific fact that there's no safe amount of secondhand smoke exposure. So even small amounts transferring between units through hallways, between walls, down air vents, causes harm to other tenants. And HUD standards, as you sort of go back to the regulation, and this is at 24 CFR 966.4F, there are a variety of tenant obligations. So I think sort of one of the intuitions at play here is that HUD, in establishing standards for safety, may be principally regulating the conduct of public housing agencies themselves. And that's not how HUD has historically interpreted or implemented this statute. So at subsection F that I referenced, it's called tenants obligations. And there are a number of other requirements for tenants that ensure that other tenants are able to safely enjoy the premises. So for example, tenants are required to dispose of their garbage in a safe and sanitary manner. And so this is no more a lifestyle requirement than that. Tenants must comport themselves in a way that doesn't interfere with the safe enjoyment of other tenants. And not smoking indoors or near the premises in a way that causes the transfer of smoke into other units, that creates a risk of fire and property damage, is entirely in keeping with those prior exercises of authority by HUD. Can I just ask you about the scope of HUD's authority as you interpret the statute? Is any level of health risk to individuals in these public housing complexes and structures fair game? Is anything enough to make it sufficiently unsafe that you believe that Congress authorized HUD to regulate it? And I guess what I'm just getting at is, you know, the example, you can imagine a world in which, you know, HUD seeks to regulate what parents are feeding their children inside public health, excuse me, public housing complexes, because we know that certain kinds of junk foods are unsafe. Is that on the table or does habitable, what is the word, or housing quality standards, does that do work to constrain HUD's authority in this context? So I want to answer generally and then take your specific example, if I may. So the statute itself is broad and wordly and doesn't direct a cost benefit analysis. So I think HUD does have significant leeway to determine what standards of safety and habitability should be. What is, and this is my second point, what is very different between this case and the example your honor gave, and also between prior actions HUD has taken and the example your honor gave, is that HUD here isn't regulating conduct that really concerns only the individual choices being made within the unit. So HUD didn't say here, we're prohibiting smoking because we think we have jurisdiction to protect people from themselves. That's not what this rule does, that's not what the prior tenant obligations that are at 966.4F do. So what these standards do is ensure that tenants are using their own property in a way that doesn't undermine the health or safety of other tenants. And so I think directing families to feed their children nutritious foods or telling people they can't drink sugary beverages is really different in kind from the rules that we're talking about here and that we've seen previously. These are not parochial in that sense. They are in keeping with general conditions of safe enjoyment. You can't have raucous parties, you can't be aggressive, you can't let your trash pile up in ways that really undermine the ability of others to go about their lives and safely enjoy the use of their own units. And this rule is entirely in keeping with that general framework. This is not the government as the nanny state, it's the government as the landlord. Precisely, your honor. Precisely, and HUD has long inhabited that role in the context of the Spending Clause legislation, where of course it's not regulating directly but attaching these conditions of safety and habitability to the federal funds that it's offering the public housing agencies. To what degree are PHA's recipients of federal funds? You're asking me to agree to that premise? No, I'm saying to what degree. To what extent, to what degree, I'm sorry. That's not in the record here because it hasn't been litigated. The funding is not insignificant, but there's nothing here to suggest that it rises to anything like the level seen in NHIB, NFIB, which was the only case where the level has been found to be coercive. And there, significantly, it was not only that the funding levels were so extreme, consisting of more than 10% of a state's total budget, it was also that the requirement issue fundamentally changed the term of the program. And the court relied on both of those factors in finding coercion. Here, neither is present. In addition to having nothing to suggest funding at that level, the program term does not fundamentally change the program. This is not a new program. It's another safety term in keeping with those that have previously been imposed in these leases. Can I revisit your conceptualization of what HUD's authority is? So, do you say the same thing even if we're talking about unattached units? You know, it's one thing to have a raucous party or a bonfire or whatever in an apartment building. One could say it's another to have it in a separate, standalone facility. So, why does that get included as authorized by this statute? Yes, Your Honor, a few things. I mean, first, these are a small percentage of the sort of relevant housing units that we're talking about, and they haven't been separately challenged, either in this litigation or in the rulemaking itself. No one sort of parsed these out in the comments and said that HUD should be regulating differently. So, there's really no big exception. But even if you just look at the risk of fire and the risk of property damage, those are absolutely things that it's within HUD's and the public housing agency's interest to regulate in that sort of proprietary role to ensure that the property damage is mitigated to a reasonable extent. The conditions being imposed, I think, just sort of stepping back a bit here, are again in keeping with what you would expect to see in other proprietary contexts, so that private landlords themselves often impose similar conditions, even with respect to townhome units or freestanding units, which is what we're talking about with the single-unit dwellings. So, those separate considerations amply support the application of the rule there. And you don't see anything about tobacco that makes it different. I mean, there are, Mr. Joseph sort of alludes to this at times in his briefing, there are Supreme Court cases and the like that really home in on the extent to which agencies can't regulate tobacco in the same way as they might other kinds of products. Yes, Your Honor, I think those cases were looking very specifically at particular exercises of authority in the context in which they arose. So, if you look, for example, at Brown and Williamson and the question whether FDA could start regulating tobacco as a drug, the court wasn't asking sort of generally, you know, was it appropriate for agencies to regulate tobacco? It was could FDA exercise that specific authority under the Federal Food, Drug, and Cosmetic Act? When doing so, applying the standards of that act would effectively lead to banning the product, which it was clear from reference to other statutes that Congress didn't intend. So again, there's no sort of general notion out there that agencies can't regulate matters affecting tobacco. It's that agencies have to exercise the authorities that they have and here HUD did precisely that. It has clear authority to establish standards of safety and habitability and the administrative record spells out the three distinct ways in which the rule against smoking in and around housing promotes the safe and habitable public housing stock. You don't have to run out the clock. Thank you, Your Honor. If there are no further questions, we ask that you affirm. Thank you, Miss Powell. Mr. Joseph, why don't you take two minutes for your rebuttal? You're muted, Mr. Joseph. Thank you. To Judge Jackson's question about single family units, that's addressed at 397 in the joint appendix. So I disagree with Miss Powell that it wasn't raised below and before the agency. To the question about reliance on funds at page 22 in the blue brief and joint appendix 300 to 318, we address the reliance. By the way, this is not a situation where they can just terminate funds, which are about almost half of the housing funds for the PHAs. So it's not a percentage of the state budget, but for the PHAs themselves, it's a huge percentage. You said that's on the record at 318? J.A. 300 to 318. Yeah, this is part of our again, it's our post our post judgment motion. You are allowed to take judicial notice on appeal. We cited that as well. The the statute here is general. It's it's it's more like the Occupational Safety and Health Act than like the Safe Drinking Water Act. And so we discussed NRDC versus EPA, where the agency has this authority to figure out what's best versus the Osh Act in the benzene case where it's like, look, safe doesn't mean risk free. This is a general statute. And so there's that tension. I don't think their statute goes as far as they're claiming. Interestingly enough, they also during the and this is I don't have a page number right now, but it is in the brief. The they were asked by OMB some questions and they said, well, if you're asking us, we don't know. And the point being that they're not experts in this field that they're trying to regulate. So they don't deserve deference and they don't. Their statute is not as as loose and as deferential as, say, the Safe Drinking Water Act or the environmental statutes. That's not their role. I am just quick. Nanny state versus landlord there. They are the regulator of the landlord. They are a nanny state here. My time is up. May I continue? I have a I'm looking at three ninety seven of the J.A. Single family housing. Can you direct me within that page? OK. I don't usually use two screens since I'm having trouble getting my cursor to move from one to the other. I apologize. Maybe it's best just to read it here. Where is it on the page? Can you tell me that? OK, I'm in the right. I'm sorry. I'm in the right ballpark now. It's the right column. Well, the smoke free policy will also apply to scattered sites and single family. Yeah. And single family units that not lead to smoke intrusion. So they were asked about single family units. Right. That's exactly right. Well, smoking in single family units does not lead to smoke intrusion in addition to the risk of fire and increase. Oh, I'm so happy. They made just the point. Miss Powell suggested that where you have single family units, there's still the risk of fire damage. And that's what they invoked. But that's I don't believe that's what Judge Jackson was asking. She's the owner, of course, of her question. But I thought she was asking about why are you concerned about intra inter unit transfer when you have a non stand alone building? The answer was, well, we're still concerned about fire damage. Oh, and right. And so they had several opportunities to raise the concern about. The concern about smoke transferring between units or smoke being exposed to people within your own unit, that is your own household members. But they didn't raise it, which suggests, which we argue suggests that the concern about intra and inter unit transfer is pretextual. They just, I mean, I'm sorry, in intra unit transfer is pretextual. They weren't concerned about that. They had several occasions where they could have cited that, this being one. But, but they didn't. I'm sorry, I thought you were saying that with multifamily units properties, their concern was with transfer from one unit to another. Right, and this policy just we just discussed that she and I, and here there is no other unit in a single family. And so the inter unit concern goes away. And as she points out, the fire safety and damage concern remains. Right. And I'm sorry, what I was what I was speaking to was they raised in the in the district court and the district court adopted the idea that they were also concerned about intra unit transfer. So that's going back to the nanny state. That is going back to the nanny state that and that was pretextual. Certainly, the the emphasis here that I took away from this was on inter unit transfer. Certainly, that's more compelling in many events. And then last, if we are at last, they don't merely have the authority to cancel funds. They have the authority to take the building. So if you ever took any money from them and then you they come up with a new requirement, they not only can terminate your funds, 100 percent, which is, as I said, almost half of the budget. But they can take the bill, they can take title to the buildings. That is coercion beyond anything that I can. Are you suggesting that that is only the case with respect to this particular condition? No. Well, naming or focusing on effects that apply to all these other conditions as well. Right. Well, right. And those other conditions presumably were done for the benefit. I mean, if you're raising a timeliness argument implicitly there, this is the first. No, no. What I'm what I'm what I'm raising is the concern that seem to be suggesting certain things are so unusual and untoward that here we now have them regulating lifestyle. Well, and Miss Powell responds, that happens all the time. Here's a bunch of other regulations that say no garbage, no. You know, you keep your apartment clean. Right. And then you say, well, if you know that if a person smokes and they violate this, you have the Fourth Amendment concern and you say that the remedy could be that they take the building away. But presumably that's the remedy with respect to these other conditions as well. So there's the only new thing here is that they've added a condition concerning smoking. But with respect to things like remedy, that's always been the case that doesn't make. Well, but again, this is a new condition after the other ones. By the way, I mean, taking out your garbage is habitability. That's that seems fair to me. But to the extent that there were these other conditions that my my clients didn't challenge, they're challenging this one because it matters to them. As any public housing authority ever found its building taken over by HUD because they violated or failed to enforce some of these tenant terms that are meant to protect habitability of other tenants. The point is they feel compelled. I mean, no, no. The answer is no, because they're going to follow it. And that's but if it's outside HUD's authority or answer, that's a good answer. I like that. And let me make sure there's no further questions for you, Mr. Joseph. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Jackson, Ginsburg